IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | |
|---|---|
| JAY A. TRIBBEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | |
| McCORMICK DISTILLING CO., INC., ) | |
| MICHAEL GRIESSER, and ) | |
| EDWARD PECHAR, ) | |
| ) | Jury Trial Demanded |
| Defendants. ) | |
| _____) | |

## COMPLAINT

Plaintiff Jay A. Tribbey, for his Complaint against defendants McCormick Distilling Co., Inc., Michael Griesser, and Edward Pechar, alleges:

## PARTIES

1. Plaintiff Jay A. Tribbey ("Tribbey") is a citizen of Illinois. He owns 20.4 % of the outstanding shares of McCormick Distilling Co., Inc.

2. Defendant McCormick Distilling Co., Inc. ("McCormick" or "the Company") is a Missouri corporation which has its principal place of business in Weston, Missouri. McCormick has 14 shareholders.

3. Defendant Edward Pechar ("Pechar") is a citizen of Texas and Chairman of the Board of Directors of McCormick. Defendant Michael Griesser ("Griesser") is a citizen of Texas and Vice-Chairman and a director of McCormick. Griesser and Pechar together own 57.6% of the outstanding shares of McCormick.

## JURISDICTION AND VENUE

4. Jurisdiction is founded on diversity of citizenship pursuant to 28 U.S.C. § 1332. The plaintiff and defendants are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. Venue in this district is proper pursuant to 28 U.S.C. § 1391(a). Venue in the St. Joseph division is proper pursuant to Local Rule 3.2(a)(2) and (4).

## PRELIMINARY STATEMENT

6. McCormick is a manufacturer and distributor of distilled spirits such as rum, tequila, whiskey, gin and vodka. With their combined stock ownership, and by acting in concert, Pechar and Griesser control McCormick's day-to-day activities and the election and decisions of all of the members of its Board of Directors. McCormick's other two directors, Richard Hillsman and Don Hammond, were both selected by Griesser and Pechar, act at their behest, and offer no independent judgment.

7. This complaint arises out of Griesser's and Pechar's sophisticated and complicated scheme and concerted activity to use their power and control over McCormick to accomplish two goals:

a. First, Griesser and Pechar have personally profited from McCormick's massive criminal enterprise involving the illegal shipping of alcoholic beverages to the Republic of Ukraine in violation of both the laws of the United States and of the Ukraine. McCormick's criminal activity was kept a secret from Tribbey and its other non-employee shareholders. Throughout this period of criminal activity - spanning over three years - Griesser and Pechar, through their control of McCormick, profited by paying themselves, at a minimum, the proceeds of McCormick's illegal activities as excessive salaries and bonuses.

2

b. Second, Griesser and Pechar have attempted to coerce Tribbey (and possibly other shareholders) into selling their ownership interest in McCormick. Griesser and Pechar seek to "squeeze out" Tribbey for four reasons: (i) to prevent him from pursuing his remedies as a shareholder to seek redress for McCormick's criminal activities; (ii) to increase their percentage ownership of McCormick by forcing Tribbey to agree to have his stock redeemed by McCormick; (iii) to increase the value of their holdings in McCormick by forcing Tribbey to sell his stock at a bargain price; and (iv) to retaliate against Tribbey for his insistence that Griesser and Pechar honor the provisions of an agreement signed by all shareholders and their wives that was designed to protect the value of minority shareholdings from oppressive tactics of a control group.

8. As a result of these activities, Griesser and Pechar have ceased to operate McCormick for the benefit of its shareholders or any other valid business purpose. Thus, under R.S. Mo. Section 351.494(2)(b) and (d) (1994), Griesser and Pechar should be removed from McCormick's Board of Directors, and a receiver should be appointed to liquidate the Company's assets.

## McCORMICK'S CRIMINAL ACTIVITY

9. According to the U.S. government, beginning in at least 1995, while Griesser and Pechar were managing and controlling McCormick, McCormick became involved with a company named Express Shipping Service ("Express Shipping") to export alcohol to Eastern Europe. McCormick assisted Express Shipping, which was located near the ports of Newark and Elizabeth, New Jersey, in smuggling millions of gallons of McCormick alcohol out of the United States disguised as cleaning solvents, but intended to be sold abroad for human consumption.

3

McCormick's part in the scheme was to color the alcohol, label it as various cleaning solutions, and falsify certain reports required to be filed with the U.S. government to show that what was being exported was not alcohol meant for human consumption.

10. The U.S. government determined that once the alcohol arrived in the Ukraine, the smugglers, using a formula provided by McCormick, removed the coloring, diluted the grain alcohol with water, added vodka flavoring and sold it on the black market. The mislabeling and falsification of records were part of a scheme whose purpose was to avoid paying steep excise taxes that Ukraine imposed on the importation of all potable alcohol. The product, which was distributed by groups controlled by the Russian mob, thus evaded millions of dollars in import taxes and tariffs.

11. McCormick participated in this scheme undetected for several years, reaping financial rewards which Griesser and Pechar used to pay themselves exorbitant salaries and bonuses.

12. On January 3, 2000, the United States Attorney for the District of New Jersey filed a Criminal Information against McCormick which stated that McCormick, participating with Express Shipping, "improperly identified the kind of distilled spirits being exported to Eastern Europe and meant for human consumption, as industrial type products not generally associated with being suitable for human consumption, using the descriptors 'Cleaning,' 'Cln Sol,' and 'Cleansol,' and the name, 'Rainbow Cleaning Solution.'" (A copy of the Criminal Information is attached hereto as Exhibit A.)

13. The U.S. government charged McCormick with violating Title 26 of the United States Code, Chapter 51, Section 5214(a)(4), and 27 CFR, Section 252.92(a), a regulation of the Bureau of Alcohol, Tobacco and Firearms, United States Treasury ("ATF"), which required

McCormick to keep and file records which accurately describe the "class and type" of distilled spirits being exported without payment of otherwise required excise taxes.

14. According to the U.S. government, McCormick "knowingly" made false entries on such required records to conceal that alcohol labeled by McCormick for export to be used for industrial purposes was actually being exported to be consumed as beverage alcohol. (Exhibit A at p. 3.)

15. On or about December 8, 1999, McCormick entered into a plea agreement with the United States Attorney for the District of New Jersey concerning McCormick's participation with Express Shipping in the exportation of beverage alcohol disguised as industrial product. (The Plea Agreement is attached as Exhibit B.)

16. On March 7, 2000, McCormick pled guilty to and admitted the criminal violations of Title 26 United States Code, Section 5603(b)(2) and Title 18 United States Code, Section 2 set forth in the Criminal Information. The United States District Court for the District of New Jersey sentenced McCormick to a fine of $10,000 and ordered restitution of $1,000,000 to be paid to the government of the Republic of Ukraine.

17. In addition to these criminal proceedings, the ATF brought civil proceedings against McCormick based on this same illegal conduct. In about May 2000, McCormick agreed to pay a fine of $1,000,000 to the federal government in four quarterly $250,000 payments beginning September 29, 2000.

18. On August 19, 2000, the New York Times published a front page story entitled "A Smuggling Operation With a Russian Twist" showing a photograph of McCormick's facilities in Weston, Missouri, with the caption "McCormick Distilling . . . a source of millions of gallons of smuggled alcohol . . . ." The article reported that federal investigators suspect that the shippers of the disguised alcohol "have ties to some of the most powerful mob clans in

Russia, and the organizations, including the Solintsevskaya and Ismailovskaya groups, that control the distribution of the alcohol there and in some countries in eastern Europe." (A copy of the article is attached as Exhibit C.)

19. The New York Times also reported that the fines paid by McCormick represent "one of the largest settlements in the history of the Bureau of Alcohol, Tobacco and Firearms" and that investigators "believe that the illegal shipments were just part of a much broader pattern of smuggling and other crimes by Russian mob groups." (Exhibit C.)

20. It is believed that Griesser and Pechar personally profited from McCormick's criminal enterprise through their personal receipt of payments in the form of commissions or fees that were the property of McCormick. This belief is based on the following:

    a. McCormick's illegal sales as described herein could not have been designed to profit McCormick, since they brought McCormick less profit and exposed it to more risk than legal activity. These illegal sales were done at prices lower and with credit terms less favorable to McCormick than McCormick obtained by legal sales. Thus, the decision to take the risk of engaging in this scheme must have been motivated by the desire of the individuals controlling McCormick to personally profit. McCormick failed to profit or otherwise benefit from the scheme because:

        i. Griesser and Pechar caused McCormick to pay brokerage commissions believed to be in excess of $1 million on commercially unreasonable terms, *i.e.*, the payment of the commissions was not dependent on McCormick's actual receipt of payments for the shipped goods. In other words, the broker got paid regardless of whether McCormick got paid.

6
Case 5:00-cv-06135-FJG   Document 1   Filed 11/20/00   Page 6 of 18

ii. Griesser and Pechar caused McCormick to extend commercially unreasonable credit terms favorable to Express Shipping that were not available to any other customer and violated McCormick's credit policies.

iii. Griesser and Pechar caused McCormick to continue to ship products, and extend additional credit, to Express Shipping even after Express Shipping had defaulted on its existing obligations to McCormick.

b. Leonid Ivanutenko, the owner of Express Shipping, pled guilty to a criminal conspiracy related to his dealings with McCormick and which involved distributing to unnamed sources proceeds, in the form of cash, from this illegal exporting scheme. During the period that the scheme was in effect, Pechar and Griesser controlled the Company and were President and Vice-president, respectively. They personally directed and managed McCormick's relationship with Express Shipping and Ivanutenko, including meeting with him on several occasions in New Jersey and at McCormick's facilities in Weston.

c. Tribbey was a member of McCormick's Board of Directors until 1998. In 1997, Tribbey began aggressively questioning Griesser and Pechar about McCormick's involvement with Express Shipping. Had he continued to be a director of McCormick, Tribbey would have had the right to further investigate the Express Shipping matter. However, in early 1998, Griesser and Pechar removed Tribbey from the Board, thus limiting his ability to investigate what was later found to be illegal activity with Express Shipping.

**THE SQUEEZE OUT CONSPIRACY AND PLAN**

21. McCormick was created in 1992 by Tribbey, Griesser and Pechar to buy the business of an active manufacturing and distributing company of distilled spirits. At that time, they believed that McCormick could make this business dramatically more successful.

22. In order to complete that purchase and successfully operate that business, McCormick needed additional capital. However, a financially sophisticated investor such as those who might invest in McCormick would not have made this investment without an "exit strategy." That is, a means by which the investor could be assured that once McCormick achieved its goal of profitability, he or she would be able to sell his or her stock for a fair price.

23. Without such an exit strategy, a minority shareholder of a privately held company such as McCormick would have no right or readily available means to "liquidate" his stock, *i.e.*, turn the investment into cash. Without an exit strategy, the only buyer for a minority shareholder's interest would be the majority shareholders who, knowing that there is no public market for a minority interest in the Company, would insist on buying only at a greatly diminished value. The reduction in value sometimes applied to a minority shareholder's stock under these circumstances is often called a "minority discount." The increase in value to the controlling shareholder is often called the "control premium."

24. At the time McCormick was being formed, the prospective shareholders, with the advice of attorneys at Mayer, Brown & Platt in Chicago, agreed upon an exit strategy that would not cause the minority shareholders to suffer a minority discount. This strategy would provide a means whereby minority shareholders would get their pro rata share of the value of McCormick without a minority discount and the controlling shareholders would not receive a control premium.

25. This exit strategy was facilitated by a 1992 Shareholder Agreement (the "Shareholder Agreement", a copy of which is attached as Exhibit D), which contains numerous provisions which restrict the ownership of McCormick's stock in a manner designed to motivate the controlling shareholders, whoever they might be, to sell McCormick after it had achieved its initial goal of profitability so that the minority shareholders' interests would be liquidated

8
Case 5:00-cv-06135-FJG   Document 1   Filed 11/20/00   Page 8 of 18

without their suffering a minority discount. The incentives set out in the Shareholder Agreement (which could not be amended without the approval of 100% of McCormick's shareholders) to accomplish this goal were:

      a.      If a shareholder died, his or her stock would be redeemed by the Company at its book value, which could be far less than its market value. (Exhibit D, §5.) This provision gave the controlling shareholders the incentive to cause McCormick to be sold rather than risk having his or her estate be forced to sell the shares at book value. Griesser and Pechar are older than Tribbey and may wish to retire prior to any sale of McCormick. This has created considerable concern on their part that, if they honor the Shareholder Agreement, they will have to sell their stock to McCormick for its book value.

      b.      If a shareholder was an employee of McCormick, once that employment was terminated for any reason, that shareholder was required to sell his or her stock to McCormick at book value. (Exhibit D, §6.) This provision gave the executive employees, such as Griesser and Pechar, the incentive to sell the Company prior to their retirement.

      c.      There can be no sale of stock to third parties without the approval of 75% of the shareholders. (Exhibit D, §3.) This provision allowed a super-majority of the shareholders the flexibility to approve a new capital offering if needed for McCormick's best interest, while allowing a 25% minority of the shareholders to veto a sale of stock (such as a sale to a majority shareholder's wife or children, or to a third party who would pay a premium to obtain control of McCormick) that would defeat the other provisions of the Shareholder Agreement which were intended to prevent the imposition of a minority discount or the realization of a control premium. This provision prevents the larger shareholders from combining their interests - such as Griesser and Pechar have done – to preserve the value of their stock beyond their death or retirement. This provided a further incentive to sell McCormick.

9

d. The Shareholder Agreement also contemplated that the Company's tax status would be maintained as a Subchapter S corporation. (Exhibit D, §§3, 8.) This was intended to make the sale of stock to outsiders less attractive, thus giving the controlling shareholders the incentive to sell McCormick.

e. The Shareholder Agreement (Exhibit D, §13) provided that new stock could not be sold to outsiders unless all shareholders had the right to purchase their pro rata share of such stock and not have their interest thus diluted. This allows the minority shareholders to preserve their pro rata ownership of McCormick, while requiring, if outsider capital is to be obtained, that its sale would only dilute the majority shareholders. This restriction provided the controlling shareholders a further incentive to sell McCormick.

26. On several occasions, Griesser and Pechar proposed to the shareholders that they amend the Shareholder Agreement to delete the incentives referred to in paragraph 25. The effect of such an amendment would be to allow Griesser and Pechar to realize a control premium if McCormick were ever sold and make any minority shareholder wishing to sell suffer a minority discount. On each such occasion, Tribbey voted against such amendments.

27. In 1998, Griesser and Pechar retaliated against Tribbey by beginning to act on their plan to squeeze him out by taking away any power he had as a shareholder and otherwise making his ownership of stock in McCormick valueless. Pechar and Griesser also seek to squeeze out Tribbey because of his expressed intent to have McCormick hold Griesser and Pechar responsible for McCormick's losses arising from the relationship with Express Shipping.

28. In furtherance of their goal to squeeze out Tribbey and possibly others, Griesser and Pechar have repeatedly breached the fiduciary duty they, as directors, officers and controlling shareholders of McCormick, owe to Tribbey. These breaches of fiduciary duty include:

10

a. Continuing to elect, and cause their nominee directors to elect, themselves as directors, and appoint themselves as key employees of McCormick, notwithstanding their operating McCormick as a criminal operation and in violation of federal regulations.

b. Continuing to pay themselves exorbitant salaries, bonuses and fees even though, (i) while under their direction and control, McCormick incurred direct losses and fines of approximately $5 million as a result of its activities with Express Shipping, and (ii) such losses, fines, salaries and bonuses eliminated any operating profits from the Company's legitimate operations available to distribute to Tribbey or the other minority shareholders.

c. Causing McCormick to repay, without a valid business purpose and about 13 months prematurely, a debt of $1,760,000, of which 83% is due personally to the four members of the Board of Directors - Griesser, Pechar, Hillsman and Hammond. This debt is evidenced by notes which do not become due until December 30, 2001. Griesser and Pechar have caused McCormick to prepay these notes without any prepayment bonus. This action is being taken by a Board of Directors with a conflict of interest, and thus violates Missouri law.

d. "Stacking" the Board of Directors with individuals who are loyal to Pechar and Griesser and will not initiate any efforts by the Company to hold them accountable for the losses, fines and penalties arising from the criminal activity involving Express Shipping.

e. Repeatedly misleading or lying to Tribbey in response to numerous inquiries about McCormick's business and criminal activity. For example, McCormick, at the direction of Griesser and Pechar, told Tribbey on February 9, 2000, that it was not aware of any criminal complaint having been filed against McCormick. A few weeks later, McCormick sent Tribbey financial statements for McCormick for the year ending 1999 that were incomplete,

deceptive and misleading. Although these documents included a reference to "a federal investigation of certain of the Company's former export customers" and to various settlement payments and legal costs, the materials did not disclose that more than three months earlier, McCormick had entered into a plea agreement as to its own criminal conduct, and that it had recently entered that plea of guilty with the federal court.

   f. Causing the removal of Tribbey from the Board of Directors as part of an effort to cover-up the criminal activity.

 29. Griesser and Pechar, also in furtherance of their goal to squeeze out Tribbey and cause him to sell his stock or agree to amend the Shareholder Agreement, have:

   a. Caused McCormick to prematurely repay loans made by Griesser and Pechar with cash provided by the shareholders. Thus, if Tribbey is to maintain his percentage interest in McCormick, he must pay McCormick his pro rata share of the Griesser/Pechar loans that are being prematurely repaid. Pechar and Griesser have taken this action with the expectation that Tribbey would rather sell back his stock to the Company than have to come up with the approximately $360,000 required to avoid dilution of his percentage ownership of McCormick.

   b. Exercised undue influence over certain employee-shareholders to cause them to vote in favor of issuing stock to raise the funds from Tribbey to make the payments to Griesser and Pechar referred to in paragraph 29(a).

   c. Threatened to further dilute Tribbey's interest by issuing additional shares of McCormick stock to outside shareholders in violation of the Shareholder Agreement.

   d. Changed, for no valid business purpose, McCormick's policy regarding the distribution of its cash. Businesses such as McCormick elect to be taxed as Subchapter S

corporations because there is no need for them to accumulate large amounts of capital. Thus, such companies typically distribute to their shareholders each year a large proportion of their cash profits, which is often the only economic advantage realized by the minority shareholders. The majority shareholders are typically paid salaries and bonuses by the company. It was the intention of the original shareholders when they formed McCormick in 1992 that the Company would distribute its cash profits each year. This policy had been followed until 1997 when Tribbey first voted against Griesser's and Pechar's proposal to amend the Shareholder Agreement. At the direction of Griesser and Pechar, McCormick eliminated all distributions to the non-employee shareholders, save what was necessary to meet their income tax obligations on their pro rata share of the earnings of McCormick.

   e. Further retaliated against Tribbey by unilaterally changing the tax reporting status of McCormick from a Subchapter S corporation to a Subchapter C corporation, eliminating all distributions to Tribbey, and causing McCormick to pay otherwise unnecessary taxes and diminish the value of Tribbey's shares.

   f. Denied Tribbey complete and accurate information concerning the operations of McCormick and the Express Shipping matter, despite his repeated requests.

## COUNT I
### JUDICIAL DISSOLUTION AND OTHER EQUITABLE RELIEF
### Against Defendant McCormick

30. Plaintiff incorporates paragraphs 1-29 by reference as if they were fully restated and realleged here.

31. Defendants have acted in a manner that is illegal, oppressive and fraudulent.

32. McCormick pled guilty to violation of Title 26 of the United States Code, Chapter 51, Section 5214(a)(4), and 27 CFR, Section 252.92(a). As a direct result of that criminal conduct, McCormick misapplied or wasted approximately $5 million of its assets.

33. McCormick's criminal activity lasted over the course of years and directly benefitted Griesser and Pechar at the expense of McCormick and other shareholders.

34. McCormick's Board of Directors has done nothing to assess responsibility for the criminal conduct and there have been no efforts to recoup from the responsible parties the funds expended on criminal and civil fines and attorneys' fees. In fact, the same individuals who controlled McCormick during the period it engaged in this criminal conduct still control the Board of Directors and McCormick's operations.

35. McCormick's criminal conduct is oppressive to minority shareholders, including Tribbey, in that McCormick incurred approximately $5 million in criminal fines, court costs, attorneys' fees and other losses. This conduct further oppressed minority shareholders by diverting McCormick's assets and resources away from legitimate, lawful business opportunities and subjecting the Company to criminal and civil liability for enabling the illegal export of purposely disguised alcohol products.

36. Defendants continue to engage in oppressive conduct by (i) covering up responsibility for the criminal conduct, (ii) retaliating against Tribbey for his efforts to cause McCormick to seek redress for the harm to McCormick as a result of the illegal activities of McCormick, (iii) violating express agreements with McCormick shareholders, (iv) planning to issue securities in violation of the Shareholder Agreement, (v) and improperly coercing Tribbey to pay funds to Griesser and Pechar (and other Board members), under the guise of a stock offering.

**WHEREFORE**, Tribbey respectfully requests that this Court grant a preliminary and permanent injunction against McCormick ordering its dissolution pursuant to R.S. Mo. Section 351.494(2)(b), (d) (1994) and award plaintiff his reasonable costs and attorneys fees. Pending dissolution, Tribbey respectfully requests that this Court remove Griesser and Pechar as officers and/or directors of McCormick; declare that Griesser and Pechar may not use Company funds to defend the claims brought against them; appoint a receiver to handle the affairs of the Company; and grant such other relief as this Court deems just and appropriate.

### COUNT II
### BREACH OF FIDUCIARY DUTY OF CARE
### Against Defendants Griesser and Pechar

37. Plaintiff incorporates paragraphs 1-36 by reference as if they were fully restated and realleged here.

38. Because Griesser and Pechar are members of the Board of Directors and collectively are controlling shareholders of McCormick, they owe a fiduciary duty of care to Tribbey as a minority shareholder.

39. The conduct of Griesser and Pechar, whereby they are using their controlling interest and director positions in McCormick to engage in the illegal and oppressive acts as alleged herein constitute breaches of the fiduciary duty of care they owe to Tribbey.

40. As a direct and proximate result of Griesser's and Pechar's breaches of their fiduciary duties owed to Tribbey, he has been damaged in an amount in excess of $75,000.

**WHEREFORE**, Tribbey respectfully requests that this Court grant the following relief:

    a. A preliminary and permanent injunction removing Griesser and Pechar as officers and/or directors of McCormick and declaring that Griesser and Pechar may not use Company funds to defend the claims brought against them;

    b. Monetary damages to Tribbey in an amount to be proven at trial;

c. Prejudgment interest;

d. Costs and reasonable attorneys' fees; and

e. Such other relief as this Court deems just and appropriate.

## COUNT III
## BREACH OF SHAREHOLDER AGREEMENT
### Against All Defendants

41. Plaintiff incorporates paragraphs 1-40 by reference as if they were fully restated and realleged here.

42. Tribbey, Griesser and Pechar, as shareholders in McCormick, and McCormick, agreed that their ownership of McCormick would be governed by the Shareholder Agreement.

43. Tribbey, Griesser, Pechar and McCormick have obligations arising out of the Shareholder Agreement.

44. There was a valid consideration for the Shareholder Agreement by virtue of the promises and performances set forth therein.

45. Tribbey has complied with all of his obligations under the Shareholder Agreement.

46. Griesser, Pechar and McCormick have breached their obligations thereunder by changing McCormick's status from a Subchapter S corporation to a Subchapter C corporation.

47. Defendants' breaches of the Shareholder Agreement have damaged Tribbey.

**WHEREFORE**, Tribbey respectfully requests that this Court grant the following relief:

a. Monetary damages to Tribbey in an amount to be proven at trial;

b. Prejudgment interest;

c. Costs and reasonable attorneys' fees; and

d. Such other relief as this Court deems just and appropriate.

# COUNT IV
# BREACH OF SUBSCRIPTION AGREEMENT
## Against All Defendants

48. Plaintiff incorporates paragraphs 1-47 by reference as if they were fully restated and realleged here.

49. The December 15, 1992 Investment Memorandum for the transaction under which Tribbey, Pechar, and Griesser acquired their McCormick stock (the "Investment Memorandum") provided that McCormick would be operated as a Subchapter S corporation. (See Investment Memorandum attached as Exhibit E.)

50. In a Subscription Agreement by which Tribbey, Pechar, and Griesser (and all other McCormick shareholders) acquired their McCormick stock, McCormick warranted that the information in the Investment Memorandum — including the statement that McCormick would operate as a Subchapter S corporation — was accurate and complete. (See Subscription Agreement Para. 5, attached as Exhibit F.)

51. Tribbey, Pechar, Griesser and McCormick agreed that ownership of McCormick stock would be governed by the Subscription Agreement and that they would have mutual obligations arising out of the Subscription Agreement.

52. There was a valid consideration for the Subscription Agreement by virtue of the promises and performances set forth therein.

53. Tribbey has complied with all of his obligations under the Subscription Agreement.

54. Defendants have breached there obligations under the Subscription Agreement by changing McCormick's status from a Subchapter S corporation to a Subchapter C corporation.

55. Defendants' breach of the Subscription Agreement has damaged Tribbey.

**WHEREFORE**, Tribbey respectfully requests that this Court grant the following relief:

    a.    Monetary damages to Tribbey in an amount to be proven at trial;

    b.    Prejudgment interest;

    c.    Costs and reasonable attorneys' fees; and

    d.    Such other relief as this Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues allowed by law.

DATED:    November 20, 2000

Respectfully submitted,

/s/ Brian D. Roche   by R.L.Ward
**SACHNOFF & WEAVER, LTD.**
Brian D. Roche
Jeffrey E. Crane
30 South Wacker Drive, Suite 2900
Chicago, IL  60606
(312) 207-1000


/s/ R. Lawrence Ward
**SHUGHART THOMSON & KILROY, PC**
R. Lawrence Ward    Mo. # 17343
James M. Humphrey    Mo. # 50200
Twelve Wyandotte Plaza
120 West 12th Street
Kansas City, MO 64105
(816) 421-3355